Samuel Israel, Defendant in Error, v. Jerry R. Selman, Plaintiff in Error.

Gen. No. 35,203.

McSURELY, J., dissenting.

Opinion filed November 9, 1931.
Rehearing denied November 23, 1931.

SISSMAN & SISSMAN, for plaintiff in error.

J. E. YAFFE, for defendant in error.

Mr. Justice Matchett delivered the opinion of the court.

By this writ of error defendant seeks to reverse a judgment in favor of plaintiff in the sum of $3,500 entered upon the finding of the court.

The amended statement of claim alleged that on September 26, 1929, at Canton, Ohio, plaintiff loaned to defendant $3,500 in cash which defendant promised to repay with interest at 7 per cent per annum; that defendant gave collateral of $7,200 on said loan and executed and delivered to plaintiff a receipt promising to return the collateral upon payment of the $3,500 with interest, and that neither principal nor interest had been repaid.

The affidavit of merits asserted a defense to the whole amount demanded; denied that defendant received $3,500 at Canton, Ohio, *on September 25, 1929,* as a loan, or that such loan was obtained upon security; alleged that the junior mortgage notes of $7,200 had been given plaintiff to replace collateral security previously deposited by defendant with plaintiff to secure a loan of $4,500 and not for the purpose of securing an additional loan. The affidavit generally denied that defendant owed the sum demanded.

It is urged in the first place that plaintiff did not sustain the allegation, by a preponderance of the evidence, that he loaned defendant $3,500. Plaintiff testified to an arrangement made orally with defendant in Chicago, whereby defendant agreed to borrow half of all the money plaintiff could obtain for defendant's use. He further testified that pursuant to that arrangement he raised $7,000 which was turned over to defendant at Canton, Ohio, on September 26, 1929, and that for $3,500 of the amount thus furnished defendant gave him collateral. The junior mortgage notes, which plaintiff said were received by him as collateral, were offered in evidence and received without objection.

Plaintiff, however, did not produce the receipt described in his amended statement of claim, and no explanation is offered for its nonproduction.

The evidence of plaintiff is corroborated by that of Irma Stueber, who testified to a conversation with defendant Selman on September 27, 1929, at Delpire's restaurant, 47th street and Lake Park avenue, when, she says, plaintiff was present. She says that defendant told her that plaintiff had given him $7,000 in cash, of which he understood $1,500 was the money of the witness; that both of them had expected to give her that amount that day but could not do so. She says that defendant said he would give her that amount with interest when a certain deal on Montrose avenue was settled, and that he would give plaintiff $3,500 and interest as soon as he received the money on the Montrose avenue deal, and that she would get the $1,500 as soon as plaintiff received his collateral back from the $3,500 which he put up. She did not receive the $1,500, but October 11, 1929, she received from plaintiff defendant's check for $8.75, interest.

On the other hand, defendant testifies that he and plaintiff talked about the trip which was about to be made to Canton; that plaintiff had $5,000 and defendant $2,000 in cash. He says that plaintiff handed over to him $5,000; that a Mr. Weissler and another man gave him some money, and that they instructed him "to go over to that book agent and place that amount of money on a certain horse." He further says, "They gave me the name of the horse. I went over there and placed all the money. He (plaintiff) said, 'here is the money. Go and place it.'" Defendant also testified that while on the train en route to Canton, plaintiff and defendant agreed that plaintiff was to get 50 per cent of the winnings and defendant 50 per cent; that there was nothing said about the proportion of losses to be borne, as there was no expectation of any losses. He

says he received from plaintiff $5,000, not $7,000; that he returned no part of it to plaintiff; that the money was all placed on the bet on the horse and was all lost; that the bet was placed with a bookmaker in Canton, Ohio.

Defendant testifies that the notes offered and received in evidence were given by him to plaintiff during the month of August as collateral security on a different loan; that there was a previous note held by plaintiff for $5,000, which amount had been received by him from plaintiff; that the notes in question were given in August, 1929, and not on September 25, 1929. Defendant says that he owed plaintiff on other transactions $5,000 less commissions, for which he claims credit. He denies that he promised plaintiff he would repay the $3,500 placed on the bet in the event of loss, but says he did not ask plaintiff to lend him the money for the purpose of laying it on the bet; that plaintiff gambled on his own accord and that defendant did so too.

Mark Weissler testified for defendant that he, Weissler, first made a proposition to defendant to go down to Canton, Ohio; that there was laid altogether on that race $9,000; that he, witness, laid $2,000 and was to get one-fourth of the winnings; that the arrangement about the share that the witness was to get was made in the presence of plaintiff, who knew that witness was to receive one-fourth share; that the agreement was by plaintiff, defendant and a Mr. Green, who was likewise to receive 25 per cent; that Green himself did not pay any money but that the $2,000 put up by the witness was put up in partnership with him.

In rebuttal plaintiff testified that defendant paid $8.75 to Miss Stueber; that defendant gave a check for that amount to the witness. The check was drawn on the First National Bank of Chicago, payable to Miss Stueber. Plaintiff further said that when the collateral

was handed to him by defendant he said, ''Whatever money you raise, you will loan me half of it''; that he was to get back $7,000 on the same day in Canton, Ohio; that defendant was to meet him on that day at the hotel where they stayed, but that the meeting did not take place.

Miss Stueber also testified in rebuttal that she spoke to defendant before she went to Canton about a loan of $1,500 that she had made September 25, 1929; that she cashed a check and received three $500 bills, which she took to plaintiff's office; that defendant arrived there later; that plaintiff already had five $1,000 bills and five $100 bills, and she, plaintiff and defendant counted the money.

If the controlling question in the case was whether defendant agreed to repay the $3,500 to plaintiff, we would be compelled to hold, since the finding of the court upon review is entitled to the same weight as the verdict of a jury (*Broderick v. O'Leary*, 112 Ill. App. 658) that the finding was not against the weight of the evidence.

A much more serious question is raised by the further contention of defendant that the money was turned over to defendant by plaintiff to be used in a gambling transaction; that the whole transaction between these parties was illegal and contrary to public policy, and that plaintiff therefore cannot recover upon a contract made for such a purpose. This defense was not set up in the affidavit of merits, perhaps for the reason that defendant did not care to furnish evidence upon which he might be indicted for a criminal offense. However, the defense was presented and the evidence on the issue received and weighed by the court. There is no doubt that upon this question the burden was upon defendant to establish the defense by a preponderance of the evidence (*Patterson v. Scott*, 142 Ill. 138). If when the evidence was offered plaintiff had

made an objection that the defense was not set up in the affidavit of merits, it would have been error on the part of the trial court to refuse to sustain the objection. No objection of this kind was made, and the evidence having been heard and the issue tried, we will not reverse and remand for the purpose of requiring the parties to file better pleadings. *Lyons v. Kanter,* 285 Ill. 336.

Plaintiff contends that as the transaction occurred at Canton, Ohio, and as there is no proof that such transaction was illegal there, the contract, under the law of comity, will be enforced in this State, citing *Roundtree v. Baker,* 52 Ill. 241; *Miller v. Wilson,* 146 Ill. 523. These cases state the undoubted general rule of law in that respect. The law of comity between the different States does not require a contract made in one State to be executed in another where it would be against the public policy of the latter State. A gambling contract or transaction is contrary to the statute and policy of the State of Illinois. (*Pope v. Hanke,* 52 Ill. App. 453, affirmed 155 Ill. 617.) Upon the issue as to whether this transaction in which these parties engaged was a gambling transaction, there is no dispute as to the facts. The evidence of defendant and Weissler to that effect is not denied. Plaintiff testifies that defendant told him he would give plaintiff the money the next day; that he would get it in Canton and that "he was going to get it betting on the horse races." Plaintiff further testified that defendant said he had tips on the horses and that he had confidence in defendant; that defendant said, "All the money you procure you loan me half of it; and on your half we will go down and bet on the horse races"; that defendant "had something official" and said, "Whatever you get at the bank, I will be responsible for half of it; you loan me half—any amount of money you can possibly get." Plaintiff further testified to the effect that de-

fendant took the money and lost all of it betting on the races.

The evidence leaves no doubt that all the parties understood that the money was obtained from plaintiff for the purpose of betting it on the races at Canton, Ohio, and that the agreement to treat half of it as a loan, assuming such agreement was made, was a part of that transaction and not severable from it.

There are cases holding that the mere knowledge by one party that money loaned to another is to be used for the purpose of gambling does not invalidate the transaction, and that seems to have been the holding of the Supreme Court of Illinois in the early case of *Lurton v. Gilliam,* 1 Scam. 577, where two parties purchased a piece of cloth at a store on credit, a memorandum being made at the time to the effect, "If Mr. Douglass is elected to Congress, P. M. Brown is to pay for the cloth; if Mr. Stuart is elected, James Lurton has it to pay." In that case the court held that the contract for the sale of the cloth was severable and distinct from the bet made and was not tainted by it. The court said:

"It does not appear that the defendants in error were in any way parties to the bet, or encouraged it; and we do not perceive that their contract for the sale and delivery of the cloth, was tainted with a participation in the original agreement between the parties. Their mere knowledge of it could not certainly connect them with it; and having parted with their property under the arrangement, common honesty surely requires that the party at whose instance it was delivered, conformably to his agreement, should be held answerable for the value of the merchandise delivered. Money loaned to be used in gaming could heretofore have been recovered back at common law, but it is now prohibited by the statute against gaming."

On the other hand, in *Mosher v. Griffin,* 51 Ill. 184, where a party sued for services rendered in fitting a

horse for a race on which money was bet, the Supreme Court held that these services, whether the race was run or not, being in aid of an offense prohibited by the statute, were in violation of the law, and that plaintiff could not recover. The court also held that the money expended for the shoeing and feed of the horse while under training was not necessarily a part of a gaming transaction, and that plaintiff might recover therefor.

The cases concerning such illegal transactions are collected in a note to *State v. Capital City Bank,* 53 A. L. R. 1356, and the general rule is there stated to be that a contract legal in itself is not rendered unenforceable by the mere fact that one of the parties has knowledge of an intended purpose of the other party by means of the contract or subject matter of it to violate some law or public policy of a state. The note cites 6 R. C. L., p. 697, to that effect. It also appears that the weight of the authority is to the effect that this rule is not applied where the evidence shows a participation by the lender in the unlawful purpose for which the money is to be used, and *Mosher v. Griffin,* 51 Ill. 184; *Hoefeld v. Ozello,* 290 Ill. 147, and *Frank v. McDonald,* 86 Ill. App. 336, are cited as authorities to that effect.

The evidence of plaintiff establishes beyond a doubt that in the whole transaction plaintiff not only knew that the money which he was raising was to be used for an unlawful purpose but also participated in such purpose and expected to profit by the transaction. His presence at Canton, Ohio, on the day of the races leaves no doubt of this controlling fact. Since (assuming his version to be true) his loan of $3,500 was made to assist in a transaction which was unlawful and contrary to the public policy of this State, he cannot be permitted to recover.

The judgment of the trial court will therefore be reversed with a finding of facts and judgment here in favor of defendant.

*Reversed with finding of facts and judgment here.*

O'Connor, P. J., concurs.

McSurely, J., dissents.

Finding of facts: We find as facts that the plaintiff, Samuel Israel, loaned to defendant, Jerry R. Selman, the sum of $3,500 to be used for the unlawful purpose of betting on horse races; that plaintiff not only had knowledge of the unlawful use to be made of the money but participated in the unlawful transaction with the expectation and hope of receiving profit therefrom; that as a matter of law he is not entitled to recover upon the claim upon which he brings suit.